### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-267 (DLF)** |
| **v.** | : | |
| | : | |
| **JAMES ROBINSON,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant James Robinson to six months' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### I.   Introduction

Defendant James Robinson, a 61-year-old machinist and martial arts instructor, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Defendant Robinson pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of six months' incarceration is appropriate in this case because,

---

[1] Although the Statement of Offense in this matter, filed on February 7, 2023, (ECF No. 21 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

after the plea agreement was entered, the government discovered that Robinson had punched a police officer in the head during the riot. In addition, before entering the building, he banged on U.S. Capitol building windows and was in the middle of a skirmish outside the Rotunda Doors as police officers attempted to block rioters from entering the building. After entering the building, Robinson chanted and celebrated in the Rotunda, pumping his fists in the air and draping a velvet rope over his shoulders. As part of his resistance to leaving the Rotunda, Robinson punched a police officer in the head. After leaving the U.S. Capitol building, he lingered on the Capitol steps and sang "Proud to be an American," demonstrating no remorse for the assault he committed moments before.

The Court must also consider that Robinson's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Robinson's crime support a sentence of six months' incarceration, 36 months of probation, 60 hours of community service, and $500 restitution in this case.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1–3.

### Defendant Robinson's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, James Robinson traveled to Washington, D.C., from his home in Schwenksville, Pennsylvania, to attend the "Stop the Steal" rally. After attending the former President's rally, Robinson walked to the U.S. Capitol.  He was wearing a black sweatshirt with a

big yellow graphic on the back and a smaller version of the yellow graphic on the front left breast.

The graphic was a yellow stylized American flag with the words "DON'T TREAD ON ME" and

the Gadsden flag's snake in the corner, as seen in Image 1 below:



*Image 1.  Screenshot from Exhibit 8 at :30.*

At 2:20 p.m., Robinson walked through a tunnel under the Senate wing steps on the

northeast side of the U.S. Capitol building and then sat on a curb for approximately 40 seconds.

Exh. 1 at :00–:48. Other rioters appeared to offer him help. He then stood up, and at approximately

2:21 p.m., began yelling and gesturing at a police officer protecting the U.S. Capitol building. Exh.

1 at :57 – 1:08; Exh. 2 at :00–:16; Exh. 14 (Location A).



*Image 2. Screenshot from Exhibit 2 at 0:12.*

After leaving the confrontation with the police officer, Robinson threw an object at the U.S. Capitol building. Exh. 1 at 1:20–1:25; Exh. 14 (Location A).



*Image 3. Cropped screenshot from Exhibit 1 at 01:22.*

4

At 2:22 p.m., Robinson walked up to and banged on a U.S. Capitol building window. Exh. 1 at 2:15–2:55; Exh. 2 at 1:20–1:38; Exh. 14 (Location A).



*Image 4. Screenshot from Exhibit 2 at 1:20.*

At 2:25 p.m., Robinson left the area by the Senate steps and headed toward and up the Rotunda steps. Exh. 3 at :25–:52. The Rotunda Doors were at the top of the steps. At 2:26 p.m., rioters breached the Rotunda Doors. It was the first breach on the east side of the U.S. Capitol. At 2:28 p.m., police officers managed to re-secure the Rotunda Doors. Robinson reached the area outside the Rotunda Doors and had a clear view of rioters fighting the police officers protecting the Rotunda Doors. Exh. 4; Exh. 14 (Location B).



*Image 5. Screenshot from Exhibit 4 at 8 seconds.*

At 2:38 p.m., rioters inside the building overwhelmed police officers and re-opened the Rotunda Doors. Robinson unlawfully entered the U.S. Capitol building two minutes later at 2:40 p.m.  Exh. 5 at :49; Exh. 14 (Location C).



*Image 6. Cropped screenshot from Exhibit 5 at :49.*

At 2:41 p.m., Robinson entered the Rotunda. Exh. 6 at 1:09; Exh. 14 (Location D).



*Image 7. Cropped screenshot from Exhibit 6 at 1:09.*

While in the Rotunda, he repeatedly raised his arms over his head, declaring victory. He embraced other rioters, nodding his head up and down. He also picked up a velvet rope and carried his trophy throughout the room, as seen in his left hand in Image 8 below.



*Image 8. Cropped screenshot from Exhibit 7 at 3:58.*

At 2:46 p.m., Robinson left the Rotunda heading west, and one minute later, he re-entered the Rotunda from the same side. Exh. 7 at 6:45–7:44; Exh. 14 (Location E). The government is uncertain of Robinson's conduct during this one-minute gap inside the Capitol building. At 2:48 p.m., Robinson left the Rotunda heading north toward the Senate chamber, and five and a half minutes later, he re-entered the Rotunda from the same side. Exh. 7 at 8:35–14:06; Exh. 14 (Location F). The government is uncertain of Robinson's conduct during this five-and-a-half-minute gap inside the Capitol building.

When Robinson re-entered the Rotunda at 2:54 p.m., police officers had already begun establishing a police line on the west side of the room. At 2:56 p.m., Robinson walked over to the police line and talked to them. At 2:59 p.m., rioters began congregating by the police line, and police had to physically push rioters away. Robinson watched. At 3:03 p.m., more police officers entered the Rotunda from the south[2] and moved along the west wall to connect with the original group of police officers. Robinson watched as dozens of officers entered the Rotunda.



*Image 9. Cropped screenshot from Exhibit 7 at 23:27.*

---

[2] In Image 9 from Exhibit 7, the camera is on the north side of the Rotunda facing south. The officers entered from the south of the room and connected with officers on the west side of the room. From the perspective of the camera, the officers entered at top of the screenshot, and moved to the right of the screenshot.

By 3:05 p.m., police officers began forming a long police line across the south and west sides of the Rotunda. Robinson positioned himself at the front of the mob facing the southern police line. The police line began pushing people east toward the Rotunda Doors. Robinson drifted back into the crowd and began shouting, arms raised over his head, appearing to rile the crowd up.



*Image 10. Cropped screenshot from Exhibit 7 at 27:38.*

At 3:08 p.m., he began confronting the police line.



*Image 11. Cropped screenshot from Exhibit 7 at 28:22.*

Robinson stood his ground and elbowed a police officer ("Officer 1")[3] away from him. Officer 1 then used a baton to push Robinson toward the Rotunda Doors. In Images 12 and 13 below, Robinson is circled in red and a purple arrow points to Officer 1.



*Images 12 and 13. Cropped screenshots from Exhibit 7 at 28:31.*

---

[3] The government attempted to identify Officer 1 but could not.

Metropolitan Police Department Sergeant D.N. joined the confrontation and physically pointed east, toward the Rotunda Doors where police officers were pushing rioters. In Image 14 below, Robinson is circled in red and a blue arrow points to Sgt. D.N.



*Image 14. Cropped screenshot from Exhibit 7 at 28:34.*

When Robinson refused to leave, Sgt. D.N. pushed Robinson with his baton. Robinson then grabbed the baton and pushed Sgt. D.N., as seen on Sgt. D.N.'s body-worn camera below.



*Image 15. Screenshot from Exhibit 8 at :31.*

Sgt. D.N. raised his baton and then Robinson struck Sgt. D.N.'s arm, pushing the baton away.



*Image 16. Screenshot from Exhibit 8 at :33.*

Sgt. D.N. pushed Robinson back. In retaliation, Robinson cocked his right fist.



*Image 17. Screenshot from Exhibit 8 at :35.*

And then Robinson punched Sgt. D.N. in the head.





*Images 18 and 19. Cropped screenshots from Exhibit 7 at 28:40 and 28:41.*

Sgt. D.N. pushed Robinson again, who retreated into the crowd. Before Robinson left, he raised his middle finger at Sgt. D.N.



*Image 20. Screenshot from Exhibit 8 at :44.*

At 3:12 p.m., Robinson left the Rotunda and headed east toward the Rotunda Doors. Exh. 9 at 2:03. At 3:14 p.m., Robinson finally exited the U.S. Capitol building, more than 33 minutes after he unlawfully entered it.



*Image 21. Screenshot from Exhibit 10 at 4:15.*

Outside on the Rotunda steps, another rioter was loudly playing the song "Proud to be American." Robinson sang along, arms raised, victorious. Exh. 11 at 5:59; Exh. 14 (Location G).



*Image 22. Screenshot from Exhibit 11 at 5:59.*

The FBI interviewed Robinson on May 5, 2022. Exh. 12. Before arriving at the Capitol, Robinson overheard a man state "all hell is breaking loose at the Capitol." Exh. 12 at 14:40–14:50. In his telling, that is why he walked to the Capitol building. Rather than show remorse for his conduct, Robinson portrayed himself as a hero. *Id.* at 15:00–15:30. In his words, he went inside the building to help another rioter's mother. *Id.* at 15:55–16:20, 17:30–17:45. He claimed he found her in the Rotunda and prevented her from being trampled.[4] *Id.* at 21:15–22:00. He stayed in the Rotunda, where he claimed he stopped one rioter from throwing a jar of paint and another rioter

---

[4] In Exhibit 4 at 40-45 seconds, Robinson was in a scrum outside the Rotunda Doors where police officers were struggling to protect the Capitol building.  The video shows that Robinson bent over.  It is unclear why he bent over.  Regardless, Robinson was adamant that he helped a woman *inside* the Capitol building because she was the reason he unlawfully entered the Capitol building.

from breaking a statue. *Id.* at 18:05–19:30. The government had video from the entire time Robinson was inside the Rotunda and has been unable to substantiate any of Robinson's claimed heroism.

When the FBI asked Robinson if he was chanting, he answered that he was sad. *Id.* at 17:20–17:30. He conveniently forgot to mention that he was yelling and chanting throughout his time in the Capitol building. When the FBI asked Robinson if he saw anyone "tussling" with the Capitol Police at the top of the steps to the Rotunda, he said no. *Id.* at 46:30–46:45. In fact, Robinson did witness rioters tussling with Capitol Police at that exact location. Exh. 4. When the FBI stated that it did not see Robinson engaging in any pushing and shoving, he nodded along (Exh. 12 at 36:30–37:00) and omitted that he elbowed Officer 1 (Exh. 7 at 28:31), grabbed Sgt. D.N.'s baton and pushed him (Exh. 8 at :31), struck Sgt. D.N.'s arm (Exh. 8 at :33), and most egregiously, punched Sgt. D.N. in the head (Exh. 7 at 28:40).

Robinson set up a GiveSendGo webpage that has raised $930. PSR ¶ 48; Exh. 13. It states "[the FBI]'s goal is to harass conservatives" and "this may bankrupt" Robinson. *Id.* As of the filing of this sentencing memo, it is still up online and has received donations as recently as September 2022.

*The Charges and Plea Agreement*

On July 29, 2022, the United States charged Robinson by criminal complaint with violating 18 U.S.C. § 1752(a)(1) & (a)(2) and 40 U.S.C. § 5104(e)(2)(D) & (e)(2)(D). On August 5, 2022, Robinson voluntarily surrendered at the FBI Resident Agency in Fort Washington, Pennsylvania. On August 8, 2022, the United States charged Robinson by a four-count Information with violating 18 U.S.C. § 1752(a)(1) & (a)(2), and 40 U.S.C. § 5104(e)(2)(D) & (e)(2)(G). On February 7, 2023, pursuant to a plea agreement, Robinson pleaded guilty to Count Four of the Information, charging

him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.     Statutory Penalties

Robinson now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. Robinson must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 6 months' incarceration, 60 hours of community service, and $500 restitution.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 571 F. Supp. 3d 1, 8 (D.D.C. 2021). While assessing Robinson's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

17

Here, the most aggravating factor is that Robinson assaulted a police officer. At 3:08 p.m., Robinson (1) grabbed Sgt. D.N.'s baton and pushed him; (2) struck Sgt. D.N.'s arm to knock his baton away; and (3) punched Sgt. D.N. in the head. Robinson was so determined to demonstrate in the Capitol that he forcibly resisted police efforts to remove him from the building.

But Robinson's interaction with Sgt. D.N. was not anomalous.  At 2:21 p.m., Robinson berated a police officer outside the Capitol and threw an object at the building.  At 2:22 p.m., Robinson physically banged on Capitol windows.  Outside the Rotunda Doors, Robinson was part of a scrum in which rioters were fighting with police officers.  Immediately before he assaulted Sgt. D.N., Robinson elbowed Officer 1.  His escalating conduct simply climaxed when his fist struck Sgt. D.N.'s head.

Robinson was proud of his actions.  Less than an hour after he berated one officer, threw an object at the U.S. Capitol, banged on the U.S. Capitol's windows, elbowed one officer, and punched another police officer in the head, Robinson stood on the steps to the Rotunda and sang "Proud to be an American."

Since January 6, 2021, Robinson has not expressed true remorse.  He created a fundraising webpage that denigrated the FBI as "harass[ing] conservatives."  Exh. 13.  In his interview, he falsely portrayed himself as a hero—not someone who engaged in violent conduct.  Exh. 12.  Even though the FBI did not then know about the assault on Sgt. D.N., they did confront him with screenshots showing he was chanting with the mob. Even in the face of that relatively minor conduct, there was no genuine contrition—despite knowing he was guilty of far more serious conduct.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 6 months' incarceration in this matter.

### B.  The History and Characteristics of Robinson

Robinson's history is unremarkable.  He grew up in Montgomery County, Pennsylvania, where he had "a typical childhood" and "never lacked for anything."  PSR ¶ 30.  Robinson owned a martial arts business for over a decade, and today earns $22 per hour as a machine operator.  *Id.* ¶¶ 40–43.  He has no criminal convictions.  *Id.* ¶ 22.  Nothing about Robinson's history mitigates his overwhelmingly willful conduct on January 6, 2021.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a significant term of incarceration.  First, Robinson minimized his conduct to the FBI.  Second, he has fundraised off of his conduct.  Third, soon after he assaulted a police officer inside the Rotunda, he was on the Rotunda steps singing "I'm proud to be an American"—showing no remorse for his violent conduct.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Robinson based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Robinson has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the

discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, ☐entencee of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum

of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Robinson's case is unusually situated. After Robinson pleaded guilty to 40 U.S.C. § 5104(e)(2)(G), the government discovered that he assaulted MPD Sgt. D.N. in the Rotunda. Had the government known about the assault prior to the plea agreement, Robinson would not have been able to plead to a petty misdemeanor. As a result, the facts of his case are unlike the facts of the vast majority of other misdemeanor defendants, and instead resemble more closely the facts of many felony defendants from January 6.

To put it simply, even if the Court sentences Robinson to the maximum six months' incarceration, it will still be the lightest sentence any January 6 defendant has received who punched a police officer.

The only other case in which the government discovered an assault after the January 6 defendant pleaded guilty to a petty misdemeanor is *United States v. Reeder*, 21-cr-166-TFH. There, the defendant grabbed a police officer's shoulder and then the officer fell on top of him. Unlike Robinson, the defendant did not strike the officer in the head. Unlike Robinson, the defendant contacted the FBI on January 19, 2021, to admit he was inside the U.S. Capitol on January 6, 2021. The Court sentenced the defendant to three months' incarceration. In handing down the sentence, the Court said, "I do not find you struck him with your fist, that would be a different situation and that would put you in jail for the full six months." Sentencing Tr. at 68, 21-cr-166-TFH (Oct. 8, 2021).

And the only other January 6 defendant who punched a police officer to receive a six-month sentence is Mark Leffingwell in Case No. 21-cr-5-ABJ. There, the defendant pleaded guilty to 18 U.S.C. § 111(a) because he struck two police officers in the head. Like Sgt. D.N. here, the officers in *Leffingwell* were wearing headgear and were attempting to clear the building when the defendant struck them. Leffingwell, however, showed immediate contrition when he apologized to the victims the same day while he was in custody post-arrest. Leffingwell also suffered from a combat injury sustained while deployed overseas in the U.S. military and received full disability benefits. The Court sentenced Leffingwell to six months. Unlike Leffingwell, Robinson has shown no contrition for his assault on Sgt. D.N. and does not have the same mitigating history and characteristics.

Every single other January 6 defendant who punched a police officer or struck an officer in the head has received more than six months' incarceration. *See, e.g.*, *United States v. Creek*, 21-cr-645-DLF (27 months' incarceration; struck one officer on his facial visor and kicked another); *United States v. Dickinson*, 21-cr-649-JDB (24 months' incarceration; threw a coffee

tumbler that hit an officer on his facial visor); *United States v. Hernandez*, 22-cr-42-CRC (24 months' incarceration; struck one officer in the head with a flag pole, no injuries); *United States v. Fairlamb*, 21-cr-120-RCL (41 months' incarceration; shoved officer and punched him in his face shield).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[6]

---

[6] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 6 months' incarceration, 36 months of probation, 60 hours community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES                          /s/ *Michael L. Jones*
United States Attorney                              MICHAEL L. JONES
D.C. Bar No. 481052                                DC Bar No. 1047027
                                                   Trial Attorney
                                                   Capitol Riot Detailee
                                                   601 D St. NW
                                                   Washington, DC 20530
                                                   (202) 252-7820
                                                   michael.jones@usdoj.gov

---

(D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

## <u>CERTIFICATE OF SERVICE</u>

On this 1st day of May, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u>/s/ *Michael L. Jones*</u>
MICHAEL L. JONES
DC Bar No. 1047027
Trial Attorney
Capitol Riot Detailee
601 D St. NW
Washington, DC 20530
(202) 252-7820
michael.jones@usdoj.gov